Mr. Eichelbaum, we'll hear from you first. May it please the court, counsel. October 26, 2018, that is the critical and only date that is on appeal before you today. On that date, we are arguing that Ms. McMurray was a teacher at Abel Middle School, where Officer Weaver was the police officer for the community over the three issues that occurred on that date, the alleged illegal search, the alleged seizure, and the alleged 14th Amendment due process claim with regard to family relations. There are four points I'd like to start with before I get to the police officer. She sent an email to the school notifying them that she was going to be out of the country in Kuwait. Now, they already knew that 12-year-old CM attended their school, and 14-year-old Jade, who's the other child of Ms. McMurray, was at that school the year before, but she was going to virtual school in her apartment. Officer school, excuse me, that day because he didn't have a ride, there wasn't anyone staying in the home with him, any adult. Now, a co-worker told her that there was a neighbor checking on them. These are all facts, material facts, that the trial court did find. Officer Weaver, her job is not just as a police officer, security for the campus, for checking on things, but she also does wellness checks. That is a traditional practice of when there's a need for a school police officer. Say that again. I missed the first words of that sentence. Officer Weaver, part of her duties is to do wellness checks. Wellness check. I'm sorry. Thank you. I got it. It's very loud. I'm sorry. And so she contacted her supervisor, Lieutenant Bruner, and said, we have a 12-year-old student who is living in an apartment, and I'd like to do a wellness check just to see that it's a safe environment for them. Now, one material fact that was incorrectly stated by the trial court was that in the order at the end, the court said that Officer Weaver contacted CPS before going to the apartment. That's not accurate. The record is very clear that it was Lieutenant Bruner who spoke to CPS, Child Protective Services, not Officer Weaver. And in fact, that will come about as very important when it comes to the transportation issue. All right. So the two of them went to the home, the apartment, and at the apartment, they met Jade. Jade actually knew, and this is very clear in the record, there's plenty of stuff in the record that talks about, Jade used to work in the office. She knew Officer Weaver. Actually, Ms. McMurray went to Officer Weaver's wedding. They were familiar with each other, so this wasn't anyone who was necessarily like an unknown police officer coming to the door. They spoke and asked if Officer Weaver could come into the apartment, and Jade said yes. Now, arguably, the end of the search is right there, the issue there, because she was invited in. And in Texas, the law is very clear that as young as a 13-year-old can invite a police officer in. There's a case, it's not in our brief, I apologize, but I can cite to it later, Lyman v. State of Texas, and it was a 2011 case that talked about 13-year-olds under circumstances can invite police officers in, and that counts as permission. But the reason she went there... Since you didn't cite it, I need to ask what court that's from. I'm sorry? You didn't cite this case? I did not cite it in my brief. What is it from? You're going to need to tell us more if you're going to do that to us. Well, okay, it's the Texas Court of Criminal Appeals, the highest Texas criminal court, which said that it was okay to do a search in that circumstances when a 13-year-old invited the police in and gave permission for them to enter the home. So one of the areas where the trial court got mixed up, and quite often takes material facts that apply only to Bruner and apply them to our officer, Weaver, and that's a common occurrence throughout the decision. But one of the things that came about here was the whole issue of was this a criminal investigation or was it simply a wellness check? And that's important because under the community caretaking doctrine, which is what a wellness check is, there isn't a wellness check doctrine, it's the community caretaking doctrine, police are invited in, they're allowed to go and do limited searches or inspections to make sure it's secure and safe. Now typically those cases involve automobiles, maybe an automobile that's been left on the side of the road or something like that. The Fifth Circuit has never ruled as to the scope of the community caretaking doctrine. And in fact, a case cited in our brief, Ramirez, said that in 2018, the same year that Officer Weaver did these things, came out and said, and this is a Western District of Texas district judge, said, the Fifth Circuit has never clearly established what the scope is and where and when you can do the community caretaking investigation or search. The way that you know, though, that this was a wellness check as opposed to investigating what the district attorney later charged Ms. McMurray with, which was child abandonment, is the scope of what actually Officer Weaver came in and looked at. She came in, and you have the body cam, that's in evidence, and what she did was she walked in, she looked around, saw it wasn't rat infested, there weren't needles or alcohol out or drugs or anything like that. She went into the kitchen, opened the refrigerator, opened the freezer. That took less than five seconds. She saw that there was food for them. She peered into an open pantry and then waited for Jade to come out of the apartment. That was the entire scope of the alleged search. Now, under the community caretaking doctrine, you don't have to have a warrant or anything for a limited search just to determine whether or not the environment was safe. Now, the trial court, for some reason, looked at this and later in their opinion said that CPS, after talking to Officer Weaver and getting this information, came to the determination that the children were not in a dangerous environment. Okay, we agree, but Officer Weaver didn't know that before she did the search, and CPS didn't know it because they didn't do the search. They took it all from Officer Weaver, who told them that. And so she's not Nostradamus. She can't figure out in advance what she's going to find in a search. She had to do that limited review. And so while there's a duality between the is there a criminal investigation or is this a wellness check, we believe the only thing that happened was a wellness check because there was no way she was going to determine whether it was a child abandoned by looking in the refrigerator or the freezer. There's nothing in there that leads to that criminal aspect. And the decision to go after Ms. McMurray came much later by the district attorney, not Officer Weaver. And remember, it's only Officer Weaver's actions on October 26th that we're here for. She's not being sued for the criminal prosecution. She's being sued for the search, the seizure, which is my next matter I'm going to discuss, and the third issue, which was the family relations. The next part is obviously the taking of the child from the apartment to the campus. But there's an interesting part that's a problem with this and another area where the law is not clearly established, and that is was she taken from an apartment or was she taken from her school? And the reason I say that is because she was attending virtual school at the time, and there is absolutely no case law. And by the way, that's the trial court's finding. She was in class, so to speak, doing her work on her computer, and there's no case law whatsoever that establishes that an apartment stays an apartment when you're going to school. And we have a whole new area of law that's going to emerge because we have homeschooling. So that would be true of all homeschooling then? It would be true for homeschooling and virtual school. That's correct. We don't have any cases whatsoever. And so for my client, Officer Weaver, there was no clearly established law to violate because we don't have any law other than the fact that you can have virtual school. That's a law. Because it's not clear that a home is a home. Correct when it's being used at the time for virtual school. And this was during school hours, so to speak, when she was on her computer doing schoolwork. That's correct. So I think it would be a wholly different thing if they came in at midnight and she was sleeping and they said, oh, I'm taking you from your school or something. Why? The child might be doing homework. Honestly, I think it's an absurd theory, but I'm willing to hear it. If the child was doing homework, I could possibly choose to make that argument, but I think you'd be forced to under the logic of your theory. Well, if my client were to do that, yes. We don't usually do wellness checks at midnight school police officers. All right. So let's turn to the whole issue of taking the child from the apartment or virtual school to the campus. Now, the decision to do that was made by Lieutenant Bruner, who was Officer Weaver's supervisor. It is very clear that he told Officer Weaver that he had talked to CPS and they were going to interview her at the campus and that they were going to take her, Jade, from the apartment to the campus. Now, the trial court found that in the record and cited to that. And so the question is, was it clearly unreasonable for Officer Weaver to not go along with what her supervisor, who was a veteran police officer and her supervisor, and what CPS, Child Protective Services, was saying they wanted Jade to be taken and brought to the campus? So Officer Weaver had, as far as I'm concerned, no option. It wasn't clearly unreasonable for her to believe that her supervisor and CPS were right in choosing to move her from one location to another. Now, this is where that case, the unestablished case of whether or not it's a school or not, also comes into play. Because there are different rules. The courts have come up with different rules for when you interview a child at home and at school. And that parents give up certain rights when a child is at school and you can take a child from a campus, let's say to CPS's office or the police station or somewhere else, you can take them from one location to another when they're being taken from a school. So, again, it wasn't clearly established in 2018, and even today there is no cases that specifically say that you can't move someone from a virtual school or that it was clearly unreasonable for her to listen to CPS and her supervisor in choosing to take the child from the one location, the apartment or virtual school, to the campus. The last issue that we have is the issue of family rights and whether or not somehow the family lost their rights because they couldn't communicate directly with Jade because Officer Bruner, or Lieutenant Bruner, excuse me, specifically told Jade, don't call your father. And the brief gets into, you know, the court gets into that quite a bit and says, you know, you denied her family rights, the ability to communicate. That's not actually true. That's not what the record says. The record does say Lieutenant Bruner, not Officer Weaver, Lieutenant Bruner did tell her not to call her father. But she was texting the entire time. Now, that leads into a really interesting, again, not clearly established area of law of have you denied someone the right to be able to communicate with their parent when they're able to text nonstop with their parent and they don't get the communication device of their choice? Obviously, they weren't going to be able to talk to her in person, the mom or the dad, because they were overseas. So the question then becomes, if they say no FaceTime but you can only call, if they say you can text but you can't tweet, if you, as long as she has a form of communication, there's no constitutional denial of the right of having access to your family in that situation when she's talking to them nonstop via text. I'm sorry. Thank you. Thank you. You've saved time for rebuttal. Mr. Bagley? Thank you. May it please the Court. My name is Peter Bagley and I represent the plaintiffs' appellees in this case, Mr. and Mrs. McMurray and their daughter, who I will refer to as JM. This is the second go-around of an appeal of a decision made by the trial court denying the two defendant officers qualified immunity. In the first go-around in McMurray v. Bruner, this court decided that where the officer there portrayed a scene of exigent circumstances to justify the officer's removal of JM from the McMurray's apartment later to an office and then to a school, he portrayed it as a scene that was necessary for safety protection. This court hailed under a totality of circumstances analysis that that argument did not hold water and basically affirmed the court's denial of qualified immunity. In this appeal, Officer Weaver is launching the appeal, not Officer Bruner in the first one, and they're trying to reframe what happened in this scene. They basically are portraying this as strictly a wellness check, where there was a search and a seizure that were incident to the welfare check. And this time they agree that there was not an emergency here. They say that in their briefing, but they still argue that JM had to be removed for her protection and to see if there was adequate adult supervision. But if you go with that line of reasoning, I find it confusing because the purpose of a welfare check is to determine somebody's well-being. And they would have seen when JM presented herself at the front door that she was fine, that she was not in any kind of danger, that she was not at any apparent risk to her physical health and safety. So it seems to me the welfare check or wellness check came to an end. The scope of it stopped. But they're kind of arguing that there's like an ongoing continuous welfare check type theory here. And what they did after that doesn't really support, doesn't seem to approach anything that would constitute a welfare check. Officer Weaver goes into the apartment. She tells JM twice that they will be taking her to a different location. She tells her not to text her mother. Then she conducts a search. And by this point in time, I will point out, the officers had no direct knowledge or good information about the caretaking arrangements. They hadn't talked to the caretaker neighbor who was watching the kids while Ms. McMurray left to go overseas. They hadn't contacted the parents. So she's telling JM not to text her mother. Even though there is food in plain sight, she still conducts a search of a refrigerator and a freezer. She takes possession of JM. They take her to an office where they interrogate her. She offers to give them her father's phone number. They don't take it. And then they remove her to a school where JM was not enrolled as a student. And as of this point, I think it's apparent from the record that this was not strictly a welfare check. In fact, I don't even understand what was the safety concern in the first place that even prompted the need to go over to the residence to check on JM. But the officers had been able to ascertain JM's well-being within seconds of meeting her at the door. They knew she wasn't in any need of immediate police assistance. I would point out that before that, though, the police officers received or Officer Weaver claims to have received a text before 7 a.m. that day. If they were really concerned about her safety and her well-being, why did it take them over two and a half hours to go to the apartment complex to check on her? What they did was basically start collecting evidence of suspected child abandonment. They interviewed work colleagues to find out about the child care arrangements. They confirmed through this process that the younger boy, CM, is already in school. Meanwhile, they learned that JM is homeschooled. So all they would have known is that JM was a homeschooled student in the apartment where she did her studies and that she probably would have been there the whole day by herself until the neighbors came home from work. That doesn't sound like, oh, my goodness, we need to go and check on her and make sure she's not on fire or anything. So they also, before they go to the apartment complex, they contact Child Protective Services. So what do you understand to be the officer's asserted basis for engaging in the search and seizure? Is it just the fact that it's a 14-year-old at home? They just think that Megan McMurray has committed child abandonment. I mean, I think that's really what's going on. But what's the factual basis for that conclusion? Is it the fact that there's a 14-year-old and a 12-year-old at home? Yes, and both parents are overseas. Adam McMurray is the father. At the time he was in the military, deployed in Syria. Megan McMurray was offered a job at an international school in Kuwait City. She went to go check it out over a four- or five-day weekend to see if it was suitable and if it would be appropriate to move the family there because they wanted to be closer to the father who was going to be there for some indeterminate period of time. I will say that before the officers went to the apartment complex, in one body cam video recorded conversation, that Officer Weaver tells one of the teachers that they suspected Megan McMurray committing child abandonment. And then in another interview with an employee, she questions the person who worked with Ms. McMurray if she knew if JM was 14 or 15 years old. And that's important because child abandonment only kicks in if you're younger than 15 years of age. So on that very day, Officer Weaver prepares an offense report in the Midland ISD Police Department under the title, Abandoning or Endangering a Child. So I agree with the judge that they were really operating in a law enforcement capacity throughout this day. Or at least there's a genuine issue of fact about this. Now, if you think that a wellness check just gives you carte blanche to do searches and seizures, then you have to kind of use your imagination to think, well, what else could they have done? I mean, maybe Officer Weaver, after checking the fridge and the freezer, maybe she could have checked the nightstands or the closets. Or perhaps she could have checked JM's computer or cell phone, if you go with this rationale. Maybe even go into the neighbor's apartment and look around. Or perhaps even take CM, who's in school, take him out of the school and remove him to a CPS office. I mean, these seem to be the possibilities that they suggest could happen if there's just this ongoing wellness check. But as far as I understand it, if this were truly like a non-criminal emergency situation, the community caretaking feature, which I would like to stress, was a new argument raised by the appellant in the appeal. That was not a point raised below. But at any rate, if that is entertained, then it seems to me that officers have to do what is necessary to just address the emergency at hand, to ameliorate the emergency. And if they figured out within seconds that JM was OK and that she wasn't injured and she was just going about her day, then it seems like the purpose of the wellness check had been completed. But in fact, the cases that even get into this, like when you see situations where you might have to engage in a warrantless entry or search, say you're looking for an injured occupant or perhaps somebody who's claiming that they might commit self-harm in such circumstances, again, the case law that I reviewed all says it has to be tailored for that limited purpose. But the common denominator in all those cases is there's some kind of crisis, there's some kind of emergency going on. But that's not what the circumstances that these officers confronted on this very day. There was no emergency, period. So I don't think there was an issue that the law was not clearly established at this time about these kinds of things. It seems to me that Officer Weber is almost advocating or trying to promote an idea that there should be formulated a new exception to the clearly established law. And so for that reason, I would suggest that that argument be overruled. Do you want to engage the theory that the home can be treated as a school or at least that it's not clearly established, that the home can't be treated as a school? Thank you for asking that. First of all, they cite no case law that I see that could support that idea. I assume their response is it's up to you to cite case law under the clearly established doctrine. Sure, but I mean like to say that a home is equivalent to a school is to me doesn't make much sense. And I think the law they're relying on is from the Gates decision in 2008 where there's kind of a lower standard for seizing a child from a school. But that is allowed when you have reason to think that they might be subject to abuse when they're returning. Is your point that fine, there's no case law that rejects their theory, but it's kind of obvious, it should be obvious that it's not a valid theory? Yeah, I think it's obvious. It's not a school. I mean, it's not a schoolhouse. I also take exception to the claim that Jane was on her computer doing her work. She had actually sent her brother off to school and then went back and fell asleep. And by the time the officers arrived, she was sleeping. During the time that Officer Weaver was inside, she then asked Officer Weaver if she could take her computer so she could do schoolwork while they went off to some location that was still unknown to JM. But on the other point they make about procedural due process and the 14th Amendment, obviously they're not arguing that the 14th Amendment doesn't apply to parents, but the argument I think they're making is that it's conditional, that it might depend on the circumstances of the parents. So the argument they made in the motion for summary judgment was that the parents were thousands of miles overseas when this happened. So that would somehow obliterate or diminish one's 14th Amendment rights. Now, in the appellate brief, they kind of go in a different direction. They claim that in addition to that fact, they say that the McMurray's had transferred custody to the neighbors who were the temporary caretakers during that long weekend. Now, they don't sign anything in the record that supports that, but I don't see any case law that says if you temporarily put your kids in the care of a sibling or a friend, you go out of town, that somehow you lose your 14th Amendment rights. The telltale sign of whether that you possess that right is if you're a parent and nothing more, and it's not conditioned on anything else. And it's the right of care, custody, and management of your children. So there's no case law that I've been able to find that would suggest that somehow it's diminished by something that's going on in the parents' lives or something that they're doing. Now, I would point out that this is kind of an inconsistent argument for Officer Weaver to make because they say that somehow the 14th Amendment right of procedural due process simply is obliterated because the parents went away, but they don't seem to say that parental responsibilities likewise go away. And in fact, that's why they felt like they could investigate Megan McMurray for the crime of abandoning her children. So that doesn't show just because they had things going on in their lives that they went away for Ms. McMurray went overseas for a temporary period of time that somehow the law becomes unclear or wasn't clearly established. I don't see that parental rights are somehow diminished based on the conditions affecting the parents. And it seems to be that you only lose your rights if somehow there's some sort of legal action that tells you that your parent rights are somehow diminished or severed. So to me, that's an inconsistent argument, and I think that point should be overruled. I want to address a couple of comments that were made by Appellant's counsel in his remarks. I take exception to the claim that Officer Weaver had some sort of diminished role here. The evidence plainly shows from the record and there are points in the record that are disputed. I think if they're disputed, they're genuinely disputed. And in this case, Officer Weaver says herself and the evidence that we presented that she was lead attorney, excuse me, lead officer to investigate this matter, as between her and Officer Weaver, that she collaborated with Officer Bruner, even though he was her superior, and that they both worked this investigation together. So there seems to be a unanimity of decision-making going on. It's not like somehow she's just been pushed aside as a subordinate role and all her discretionary powers and decision-making just goes away and she's following the lead of her supervisor. And in fact, the supervisor, by contrast, he says in his deposition testimony that he was only there to help. He was not there to have any kind of oversight role with respect to what's going on. So if there's an argument about Ms. Weaver's status or role in this episode, then it's something that's simply genuinely disputed and should go before a jury to let them sort that out. Again, I'd like to just reemphasize, I don't understand the need. What was it that created need for anybody to go to the apartment complex to see if the environment was safe? All they knew was that there was a 14-year-old there in the apartment who may have been doing her home studies and that adults might come later in the day. That doesn't mean by definition it's somehow unsafe. And I think it's apparent from the evidence that we refer to in our brief that this was strictly an effort to go about to investigate Ms. McMurray for the crime of child abandonment. And in fact, I would point out that even their briefing supports that. They say in their conclusion in prayer that they were investigating whether the children were left to be exposed to an unreasonable risk of harm. And that is one of the elements of the crime of child abandonment under Texas Penal Code 22.041. So I think they almost concede that they were investigating this matter as a law enforcement effort to investigate a crime. As I also pointed out, I think a lot of the arguments that they've made, they're bristling against some of the factual findings of the judge. I feel like that's not appropriate for this court to review, that they are just basically challenging assumptions and fact findings made by the judge. That seems to be outside the appellate jurisdiction this court has. And so I think any of those kinds of arguments should be discounted. And I see that I'm almost out of time, Your Honors. So with that, in sum, the trial court correctly denied the qualified immunity defense for both the Fourth Amendment and the Fourteenth Amendment claims. And I ask that this panel affirm the trial court's order. Thank you. Thank you, Mr. Bagley. Mr. Eichelwong, you've reserved five minutes. Thank you, Your Honors. Let me start with just one quick thing, the idea of she was lead police officer. What the record actually says is that whoever starts the report, the police report, initially drafts the beginning of the police report of any investigation. And every school police officer, every time they do a wellness check, they have to create a report. Because she was the one who started it, she's considered the lead, and that's what it says, and that's what the record reflects. And then Officer Bruner added things, and other things were added throughout. But that's the only reason that the word lead is anything. She was always under the supervision of Officer Bruner, and that's why Officer Bruner, the record is clear, said we are going to take the child per CPS to the campus to be interviewed with the other child than whoever else gets interviewed. And that's in the record at page 2499, where Lieutenant Bruner says that. So that's very important. But they raised another real important issue, and that is the trial court's interesting analysis of the material facts and law. The trial court, for some reason, especially in the last paragraph of its order, said that it is very clear that this case should go to trial because this court, the Fifth Circuit, has already said that it was an illegal search, an illegal seizure, and that there was 14th Amendment violations. When did this court say that? They said it for Lieutenant Bruner when he appealed his motion to dismiss. Well, a trial court can't rely, as law of the case, on the Fifth Circuit's decision on a motion to dismiss because at that trial court, at that case, at that time, this court was looking at the genuine issue, well, the issues that were well-pled facts in a complaint, and it wasn't even a verified complaint. In summary judgment, you're only supposed to look at the evidence in the record. But the trial court went outside of that and cited to you as it's already there, and therefore I'm going to find that it was an illegal search, it was an illegal seizure, and that the family violations with regard to the 14th Amendment are a fact. And so that was an improper conclusion by the trial court, and that in and of itself is grounds for reversal. Can I ask you the same question that I asked the opposing counsel? Is the officer's basis for doing the search and ultimately the seizure essentially is this issue of the 14-year-old and the 12-year-old being alone at home? Well, Your Honor, that is the initial reason for conducting the search or going to the apartment. And that's what your brief does say. Yes. A 14-year-old is too young to be without adult supervision. It was to go to see that they were in a safe environment. And so she looked in and, like I said, saw it wasn't rat-infested, wasn't a problem, and we don't know whether Officer Weaver would have made the decision at that point to say we're going to leave them alone and we're going to come back because her supervisor told her that we are going to take the child to the campus, and CPS is in agreement with this. You said you wanted to make sure the house wasn't rat-infested and whatnot for the apartment. Yes, that's part of the wellness check. Just to be clear, was there an evidentiary basis or any basis for that assumption? I'm just trying to make sure I understand your brief correctly. It seems to say a 14-year-old is too young to be without adult supervision, and that's the basis. Well, there are... It could be rat-infested, it could be fine. Yes, but the part of the wellness check and the community caretaking was to go and see whether or not they were in a safe environment, not to determine whether or not it was child abandonment because now... Okay, but again, the officer's understanding that... At 16 or 18 years old, it would have been different, I'm sure. Okay, so it's the 14-year-old. That's what you're focused on? Yes. Okay, thank you. Yes, I do think that that would be a fair statement. All right. Let me just close because I see I have 25 seconds. This is a very important case for school security officers, for police officers, for law enforcement. There is no clearly established law with regard to the community caretaking doctrine in this circuit. They need it. It would be unfair for you to declare what it is today and then say she should have known it in 2018. That's not how qualified immunity works. And so officers are looking to you... May I finish my sentence? Please. Okay, are looking to you to clearly establish the law so that they know what they can and cannot do on a wellness check. And we would appreciate it if you would grant the qualified immunity at this time. Thank you. Thank you. The case is submitted. We'll now call the next case.